STATE of Missouri,
Plaintiff-Respondent,

v.

Everett TAYLOR, Defendant-Appellant.

No. 67053.

Supreme Court of Missouri,
En Banc.

Dec. 17, 1985.

Rehearing Denied Jan. 15, 1986.

Dorothy Hirzy, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Mary Elise Burnett, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HIGGINS, Chief Justice.

Everett D. Taylor was convicted by a jury of murder in the second degree and sentenced to thirty years imprisonment. The court of appeals ordered a new trial because the trial court erred by excluding evidence of a subsequent burglary of the victim's home and by admitting into evidence a knife found in the kitchen drawer of the victim's apartment. This Court granted transfer to determine: (1) whether the trial court erred in refusing defendant's evidence of a no-force burglary of the murder victim's home committed subsequent to the murder where there was no evidence connecting the burglar with the murder and it was alleged to show the existence of a key to the victim's house; and (2) whether a knife found in the kitchen drawer of the victim's house was properly admitted into evidence where there was no way to determine if this was the knife used to kill the victim. Affirmed.

During the evening of June 29, 1983, defendant and the victim, his wife, Joyce Taylor, played cards on the front porch of their apartment with their daughter and several other family members. At approximately 10:40 p.m., everyone except defendant, his wife and daughter left. At approximately 2:40 a.m., defendant called the police and told them someone had come through the bedroom window and stabbed his wife. The police found Joyce Taylor's body nude, wrapped in a quilt, lying on the floor between the bed and a wall.

One of the police officers spoke with Valerie Brown, the tenant in the apartment above. When the officer informed Ms. Brown that defendant's wife was dead, Ms. Brown responded, "One day I knew he was going to kill her." This belief was based on numerous fights Ms. Brown had overheard between defendant and his wife al-

though she had heard nothing from defendant's apartment the night of the murder.

An investigation of the scene showed there had been no forced entry. The door to the apartment had been locked and there was no sign of a break-in. A screen in the window above the body had been cut; expert testimony established that it had been cut from the inside. The dirt on the outside window ledge was undisturbed and there were no footprints on the ground outside the window. Small amounts of blood were found on the cut screen and on the edge of the bathtub. Approximately five hours after the initial investigation, officers took a knife from a kitchen drawer. While the knife was not proven to be the murder weapon, expert testimony established this type of knife was consistent with the wounds in the victim's body.

Upon completion of the investigation, defendant was advised he was a suspect and was taken to the homicide office. After being advised of his constitutional rights, defendant made a statement to the police. He said his wife and daughter had gone to bed and he had fallen asleep in the living room with the stereo playing. At approximately 2:00 a.m., he went into the bedroom and saw his wife on the floor. He took his daughter to a neighbor's and called the police.

Lieutenant Michael Beck supervised the investigation. On July 1, 1983, he advised defendant that a warrant had been issued against him for capital murder. Defendant began crying and trembling. Then he said, "I can't say it. I can't say that I killed her." The officer asked defendant to tell him "what happened, the size of the knife and so forth." Defendant started to show the size of the knife but dropped his hands saying, "I don't want to say anything else. I want an attorney."

Appellant contends the trial court erred in excluding evidence of a burglary with no forced entry of his apartment apparently committed by a cousin of Valerie Brown two days after the murder. The trial court based its ruling on *State v. Stokes*, 638 S.W.2d 715 (Mo. banc 1982), *cert. denied*, 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488, where this Court stated that evidence that another person had an opportunity to commit the crime for which defendant is on trial is inadmissible without proof that the other person committed some act directly connecting him with the crime. *Id.* at 723. Appellant argues this evidence shows the existence of another key to the apartment and refutes the State's theory that his presence in his apartment with no evidence of forced entry established that only he could have committed the crime. Respondent argues the existence of a second key is speculative and the evidence is not admissible under *State v. Stokes*.

The trial court has broad discretion regarding matters of relevancy and its ruling will be overturned only upon a showing of abuse of discretion. *State v. Blair*, 638 S.W.2d 739, 757 (Mo. banc 1982), *cert. denied*, 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472. Whether evidence, even though relevant, is inadmissible because it is too remote to be material is a matter resting in the discretion of the trial judge. *State v. Feger*, 340 S.W.2d 716, 725 (Mo. 1960); *State v. Maddox*, 657 S.W.2d 719 (Mo.App.1983); *State v. Baker*, 626 S.W.2d 680 (Mo.App.1981). The existence of a second key was based solely on the subsequent burglary of the apartment without forced entry. The trial court did not abuse its discretion by finding that this evidence did no more than raise a conjectural inference that Valerie Brown's cousin gained entry to defendant's apartment and murdered Joyce Taylor and is therefore inadmissible because no evidence directly connected him with the crime. *State v. Stokes*, 638 S.W.2d at 723.

Appellant contends the trial court erred in admitting into evidence a knife which was found in the kitchen drawer of his apartment some hours after the murder and a photograph of a silverware tray in the drawer showing knives, forks and spoons. Appellant argues the evidence was not admissible because there was no way of determining if the knife was used to kill the victim. Respondent contends the

evidence was admissible because expert testimony established that the knife was consistent with the type used to inflict the wounds and because it was found at the scene of the murder soon after the initial investigation of the crime.

■ A weapon with which the crime might have been committed, found near the time and scene of the crime, is relevant to show the means by which the crime was committed. *State v. Dodson*, 642 S.W.2d 641, 642 (Mo.1982). "Articles, instruments and weapons that have a tendency to explain the manner in which a crime was committed that are found at or near the scene of the crime subsequent to the commission of the crime are generally admissible." *State v. Bolder*, 635 S.W.2d 673, 688 (Mo. banc 1982). The trial court did not abuse its discretion by admitting the knife and photograph into evidence.

The judgment of the trial court is affirmed.

BILLINGS, BLACKMAR and DONNELLY, JJ., and CROW and FLANIGAN, Special Judges, concur.

WELLIVER, J., dissents in separate opinion filed.

ROBERTSON and RENDLEN, JJ., not sitting.

WELLIVER, Judge, dissenting.

I respectfully dissent.

When a murder is committed in a locked room and there is evidence that at least one other outside person had a key to the apartment, and, when there was within 24 to 48 hours a burglary of the murder premises without forced entry, and, when the person having the other key was a close relative (cousin) of the state's principal witness, there is no doubt that such evidence is relevant in determining who could have committed the murder. This is especially true when in the state's closing argument, the prosecutor, in arguing that there had

been no forced entry said, "have you heard anything from the defense about a key?"

Retrial of this case is a small price to pay for maintaining the integrity of "fair trial." Rather than taking this case for the obvious reason of changing the result of the court of appeals opinion,[1] this Court should be commending our court of appeals for the courage it displayed in standing up for fair trial in face of the current swing of the pendulum of public opinion in the direction of getting tougher on crime.

APPENDIX A

"Appeal from a conviction for murder in the second degree. Defendant was sentenced to a term of thirty years imprisonment. We reverse and remand.

Defendant was charged by indictment with one count of capital murder for the stabbing death of his wife sometime between the late night and early morning hours of June 29 and 30, 1983. The jury returned a verdict of guilty on the lesser included offense of murder in the second degree. Defendant was sentenced to thirty years imprisonment as a persistent offender. The conviction is based upon circumstantial evidence.

Viewed in the light most favorable to the verdict, the following facts were adduced at trial: Sometime between approximately 10:30 p.m. and 2:30 a.m. on June 29 and 30, 1983, defendant's wife was stabbed to death in the bedroom she shared with defendant. Her body was found nude, wrapped in a quilt, lying on the floor between the bed and a wall. Earlier, on the evening of June 29, 1983, the victim and defendant were on the front porch of their apartment house in St. Louis, playing cards with their daughter, defendant's mother and other family members. The house contained two apartments which shared a common entry. Everyone left at approximately 10:40 p.m.

At approximately 2:41 a.m., defendant placed a call to the police. He asked the police to come to his home since someone

1. See Appendix A.

had come through the bedroom window and stabbed his wife. He said it looked like she had been stabbed all over.

When the police arrived, defendant spoke with an officer. Defendant appeared nervous. He told the officer he had been sleeping in the living room, walked into the bedroom and found his wife. He then asked the officer to go into the house to see if his wife still had her rings on her finger. He seemed more concerned about the rings than his wife's condition.

A second officer questioned the tenant in the apartment above defendant's apartment. She had spoken with defendant and the others on the porch earlier that evening. She left the house about 8:00 p.m. and returned at 11:00 p.m. When she returned no one was out front, and all was quiet. She went up to her apartment and talked on the phone until 2:00 a.m. She then went to sleep and was awakened by the police. When told defendant's wife was dead, she responded, "One day I knew he was going to kill her." This belief was based on numerous fights she had overheard between defendant and his wife. The walls were so thin she could almost hear everything. She had seen defendant's wife with bruises and black eyes. That night the upstairs tenant had heard nothing from defendant's apartment.

An investigation of the scene revealed there had been no forced entry. Victim's body was nude, wrapped in a quilt, and lying on the floor between the bed and the wall. A screen in a window above the body had been cut from the inside. Some blood was on the screen where it had been cut. The dirt on the ledge outside the window was undisturbed. No foot prints were on the ground outside the window. A small amount of dried, diluted blood was found on the edge of the bathtub. A police officer later seized a knife from a kitchen drawer.

After investigation of the scene was completed, defendant was advised he was a suspect and was taken to the homicide office. There he made a statement to police. In his statement he said he had been playing cards with his wife and other family members from about 8:00 p.m. to 10:00 p.m. At 10:00 p.m. or 10:15 p.m., his wife went to bed and he went into the living room, where he fell asleep with the radio playing. Sometime after 2:00 a.m. he woke up, went into the bedroom and started to undress, when he saw his wife on the floor.

Defendant then took his daughter to a neighbor's house and told him his wife had been stabbed. The police asked how he knew she had been stabbed. He said he heard no shots, so he knew she must have been stabbed. He also saw a hole in her right shoulder. He was able to see because the room was partially lit by a mercury vapor light outside. At trial a police officer testified he was unable to see the body when he stood in the bedroom with the lights off.

Defendant described his relationship with his wife. They had separated previously but were back together and had gotten along beautifully. In response to statements concerning beating his wife, defendant said he had beaten her and would later go to bed with her. He stated she would not mention her beatings to her friends at work because she kept her business at home. The arguments centered around his unemployment. His wife repeatedly told him to move back with his mother. Defendant stated he did not touch his wife on the night in question. However, an analysis of nail scrapings taken from him indicated the presence of blood. The quantity was insufficient to type.

Defendant subsequently made a written statement and tape recorded statement. The content was substantially the same as given during the first, oral statement. However, he stated the door to the apartment was locked when he went to sleep in the living room. He also mentioned he was wearing cut-off bib overalls and had been wearing these all evening. The upstairs tenant, however, testified he had been wearing gym shorts and later was wearing cut-off bib overalls.

On July 1, 1983, a police officer informed defendant a warrant had been issued

against him for capital murder. Defendant began talking, crying and trembling. He stated he had been in the living room, went to the bedroom where his wife was lying on the bed awake. Crying more and trembling, he said, "I can't say it. I can't say that I killed her." The officer asked defendant to tell him what happened, the size of the knife and so forth. Defendant started to show the size of the knife, then dropped his hands and said he didn't want to say anything else. He wanted an attorney. Defendant did not testify at trial.

· Defendant asserts in his first point state failed to make a submissible case because state's evidence was circumstantial and state presented no motive for the killing. Further, defendant cooperated fully with police and denied involvement in the crime. The facts outlined above certainly reveal motive. Assuming they do not, motive is not an element of the crime, and proof of it is not essential to sustain a conviction. *State v. Abbott,* 654 S.W.2d 260, 268 (Mo. App.1983). While the evidence was sufficient for submissibility, the state's case against defendant was not a strong case.

Defendant properly complains of the exclusion of evidence of a subsequent burglary at victim's home. State's case consisted entirely of circumstantial evidence. Part of that evidence was there was no forced entry to the Taylor apartment on the night wife was murdered. Evidence of a subsequent burglary was offered to show the existence of a key to the Taylor apartment. There was no forced entry at the time of the burglary, which occurred shortly after the victim was killed. Evidence of the subsequent burglary should have been admitted.

Defendant's presence in his apartment with no evidence of forced entry and the screen cut from the inside was essential to the state's case against him. Defendant had told police before he went to sleep in the living room on the night of the murder, he had locked the only door to the apartment. He also told police he had to unlock the door before taking his daughter to a neighbor.

Evidence of illegal entrance without forcible entry into the same apartment within 24 to 48 hours after the murder was excluded at trial. "As a general rule, evidence explaining evidence previously introduced, or showing that the inference arising or sought to be drawn therefrom is not warranted, is admissible." *State v. Ford,* 639 S.W.2d 573, 576 (Mo.1982). This rule is especially applicable where the accused seeks to explain incriminating evidence introduced by the state. *Id.*

In the state's closing argument, the prosecutor, arguing there was no forced entry, remarked "have you heard anything from the defense about a key?" Considering the nature of state's evidence regarding defendant's commission of the crime, it is impossible to conclude with any degree of certainty defendant was not prejudiced by the exclusion of evidence of a subsequent burglary on the premises.

Defendant's final point concerns the admission into evidence of a knife found in a kitchen drawer of the Taylor apartment some hours after the stabbing and a photograph of a plastic silverware tray in a kitchen drawer showing knives, forks and spoons. There was no blood on the knife and no way to determine whether this knife was used to kill victim. While this evidence may not be prejudicial in other fact situations, considering the nature of state's evidence in this case, we believe these exhibits should not have been admitted. See *State v. Merritt,* 460 S.W.2d 591 (Mo.1970).

The case is reversed and remanded for new trial."